# Exhibit E

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION (AT CLEVELAND)

| | |
|---|---|
| WHITEAMIRE CLINIC, P.A., INC., an Ohio corporation, individually and as the representative of a class of similarly-situated persons,<br><br>    Plaintiff,<br><br>v.<br><br>CARTRIDGE WORLD NORTH AMERICA, LLC and JOHN DOES 1-10,<br><br>    Defendants. | Civil Action No. 1:16-cv-00226<br><br>Senior Judge Christopher A. Boyko<br><br>**SUBPOENA FOR DOCUMENTS TO CARTRIDGE WORLD USA, LLC** |

To:    **Cartridge World USA, LLC**
**3917 Mercy Drive**
**McHenry, IL 60051**

YOU ARE COMMANDED to produce at the place, date, and time specified below the following:

*See* **Exhibit A (attached hereto)**

| Place:<br><br>**Anderson+Wanca**<br>**3701 Algonquin Road, Suite 500**<br>**Rolling Meadows, IL 60008** | Date and Time:<br><br>**April 9, 2021, 10:00 am (CST)** |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  **March 11, 2021**

*CLERK OF COURT*

_____          OR  _____
Signature of Clerk or Deputy Clerk                    Attorney's signature

The name, address, e-mail address, and telephone number of the attorney representing *(name of    party)*,  Whiteamire Clinic, P.A., Inc.,  who issues or requests this subpoena, are: Matthew Stubbs, Montgomery, Jonson, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202, Email:  mstubbs@mojolaw.com, Phone: 513-241-4722.

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

| DATE SERVED: | PLACE:<br><br>**Cartridge World USA, LLC**<br>**3917 Mercy Drive**<br>**McHenry, IL 60051** |
|---|---|
| SERVED ON (PRINT NAME): | MANNER OF SERVICE: |
| SERVED BY (PRINT NAME):<br><br>**Matthew Stubbs** | TITLE:<br><br>**Attorney** |

**Federal Rule of Civil Procedure 45 (c), (d), (e), and (g)**

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

# EXHIBIT A

## WHITEAMIRE CLINIC, P.A., INC. v.
## CARTRIDGE WORLD NORTH AMERICA LLC, et al.
### Case No. 1:16-cv-00226

Produce true and accurate copies of all documents, including electronically-stored information, that meet the following descriptions:

1.  Financial statements and tax filings of Cartridge World North America, LLC from 2015 to 2020;

2.  Financial statements and tax filings of Cartridge World USA, LLC from 2018 to the present;

3.  Payroll records of Cartridge World North America, LLC from 2015 to 2020;

4.  Payroll records of Cartridge World USA, LLC from 2018 to the present;

5.  Past and current leases and/or rental agreements for the property located at 3917 Mercy Drive, McHenry, IL 60051 from 2015 to the present;

6.  Past and current contracts with any provider of goods or services to/for the property located at 3917 Mercy Drive, McHenry, IL 60051 from 2015 to the present;

7.  Invoices from any provider of goods or services to/for the property located at 3917 Mercy Drive, McHenry, IL 60051 from 2015 to the present;

8.  Monthly statements for any bank (or equivalent financial) account held by Cartridge World North America, LLC from 2015 to 2020;

9.  Monthly statements for any bank (or equivalent financial) account held by Cartridge World USA, LLC from 2018 to the present;

10. Franchise agreements for "Cartridge World" franchises operating in the United States of America from 2015 to the present;

11.     Invoices, bills, or other demands for money from Cartridge World Australia Pty, Ltd. to Cartridge World North America, LLC from 2017 to the present;

12.     Invoices, bills, or other demands for money from Cartridge Australia Pty. Ltd to Cartridge World USA, LLC from 2018 to the present;

13.     Contracts for the purchase/sale of the brand licensing rights of "Cartridge World" by Blackford Capital and/or Cartridge World USA, LLC;

14.     Contracts for the assignment of franchise agreements or other property from Cartridge World North America, LLC to Cartridge World USA, LLC;

15.     Contracts or other documents granting or withdrawing the right to conduct the "License Business" as that term is defined in Paragraph C of the "Background" section of the Cartridge World License Agreement (attached hereto as "Exhibit B") to Cartridge World North America, LLC;

16.     Contracts or other documents assigning or granting the right to conduct the "License Business" as that term is defined in Paragraph C of the "Background" section of the Cartridge World License Agreement to Cartridge World USA, LLC;

17.     Bank statements, wire transfers, or other records documenting payment of the "Initial License Fee" (of $2,600,000) per Item 8 of Exhibit A of the Cartridge World License Agreement;

18.     Documents provided to or reviewed by Cartridge World USA, LLC in contemplation or preparation for the transaction that is the subject of the Cartridge World License Agreement (*i.e.,* the "due diligence" documents);

19.     Records of the incorporation and minutes of Cartridge World USA, LLC;

20.     Correspondence (letters, emails, texts, *etc.)* to or from Martin Stein in regard to the Cartridge World License Agreement and/or the lawsuit brought by Whiteamire Clinic, P.A., Inc. against Cartridge World North America, LLC identified as Case No. 1:16-cv-00226 ("the Whiteamire junk fax suit");

21.     Correspondence (letters, emails, texts, *etc.)* to or from Mark Pinner in regard to the Cartridge World License Agreement

and/or the lawsuit brought by Whiteamire Clinic, P.A., Inc. against Cartridge World North America, LLC identified as Case No. 1:16-cv-00226 ("the Whiteamire junk fax suit");

22.     Correspondence (letters, emails, texts, *etc.)* to or from Rod Young in regard to the Cartridge World License Agreement and/or the lawsuit brought by Whiteamire Clinic, P.A., Inc. against Cartridge World North America, LLC identified as Case No. 1:16-cv-00226 ("the Whiteamire junk fax suit"); and

23.     Correspondence (letters, emails, texts, *etc.)* to or from Edwin Liu in regard to the Cartridge World License Agreement and/or the lawsuit brought by Whiteamire Clinic, P.A., Inc. against Cartridge World North America, LLC identified as Case No. 1:16-cv-00226 ("the Whiteamire junk fax suit")



EXHIBIT

B

**Cartridge World®**

---

**US LICENSE AGREEMENT**

---

**DATED:  23 December 2019**

**BETWEEN**

**Cartridge World Australia Pty Ltd.**

("Licensor")

**- and -**

**Cartridge World North America, LLC**

("Former Franchisor")

**- and -**

**Cartridge World USA, LLC**

("Licensee")

## TABLE OF CONTENTS

BACKGROUND .................................................................................................................3

1    DEFINITIONS AND INTERPRETATION ...................................................................3

2    GRANT ...............................................................................................................................8

3    TERM ..................................................................................................................................9

4    RENEWAL ..........................................................................................................................9

5    PRODUCT ...........................................................................................................................9

6    MONIES PAYABLE BY THE LICENSEE ..............................................................9

7    LICENSOR'S DUTIES ................................................................................................10

8    LICENSEE'S DUTIES ................................................................................................11

9    FINANCIAL REPORTING ...........................................................................................15

10    RESTRICTIONS WHERE LICENSEE IS TRUSTEE OR TRUST .....................15

11    LEGAL COSTS ............................................................................................................15

12    INDEMNITY ....................................................................................................................15

13    OWNERSHIP OF INTELLECTUAL PROPERTY ................................................16

14    NON-DISPARAGEMENT ............................................................................................19

15    CONFIDENTIAL INFORMATION .............................................................................19

16    THE SYSTEM ................................................................................................................19

17    MARKETING AND PROMOTION .............................................................................19

18    INSURANCE ...................................................................................................................20

19    TRANSFER OF INTEREST .......................................................................................20

20    DEFAULT AND TERMINATION ...............................................................................21

21    OBLIGATIONS UPON TERMINATION OR EXPIRATION ................................22

22    CORPORATE AND PARTNERSHIP LICENSEES .............................................24

23    TAXES, PERMITS, AND COMPLIANCE WITH LAW .......................................24

24    INDEPENDENT CONTRACTOR, LIABILITY, AND INDEMNIFICATION .........25

25    APPROVALS AND WAIVERS .................................................................................25

26    NOTICES ........................................................................................................................25

27    ENTIRE AGREEMENT ................................................................................................26

28    SEVERABILITY AND CONSTRUCTION ...............................................................26

29    GOVERNING LAW ......................................................................................................26

30    DISPUTE RESOLUTION ...........................................................................................26

31    MISCELLANEOUS ......................................................................................................27

32    SPECIAL CONDITIONS .............................................................................................28

**EXHIBIT A DATA SHEET** ...................................................................................................**31**

**EXHIBIT B  THE "MARKS"** ...............................................................................................**33**

**EXHIBIT C  COMPUTER SOFTWARE, WEBSITE AND INTRANET USAGE**...........................**34**

## CARTRIDGE WORLD LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "**Agreement**") is made and entered into on 23 December 2019 by and between Cartridge World Australia Pty Ltd, of Level 6, 447 Kent Street Sydney 2000 Australia (the "**Licensor**"), and Cartridge World North America, LLC of 3917 Mercy Drive, McHenry, IL. 60050 United States of America (the "**Former Franchisor**"), and Cartridge World USA, LLC of 190 Monroe Avenue NW, Suite 600 Grand Rapids, MI 49503 (the "**Licensee**").

### BACKGROUND

A       The Licensor owns the Marks and the System (each as defined herein) relating to the establishment and operation of the Business.

B       The Former Franchisor has operated the Business in the United States of America (the "**Territory**").

C       The Licensee wishes to be licensed to use the Intellectual Property and the System to operate the Business in the Territory on the terms set forth herein (the "**License Business**").

D       The Licensor has developed a special program whereby the Licensor shall procure the assignment to the Licensee all the right, title and interest the Former Franchisor holds in the existing Master Franchise and Unit Franchise Agreements in the Territory and certain specified agreements with suppliers in connection with the operation of the License Business.

E       The Licensee wishes to maintain and develop the System within the Territory and to obtain from the Licensor the right to operate the System, sell the Products and Services, appoint suppliers, receive rebates from suppliers and grant rights to "**Master Franchisees**" and "**Unit Franchisees**" (collectively, "**Franchisees**") to establish Master Franchises and Unit Franchises (collectively, "**Franchises**") and operate Stores in the Territory, all pursuant to individual Master Franchise Agreements and Unit Franchise Agreements (each as defined herein).

F       The Licensee understands and acknowledges the importance of operating the License Business to a high standards of quality, appearance, and service and selling the Products and Services, employing B2B sales people, ensuring Franchisees conform to policies and procedures and recruiting, screening, selecting only suitably qualified Franchisees, and the importance of ensuring that  all Franchisees in the Territory are inducted, trained and supported by the Licensee.

G       The parties, in consideration of the undertakings and commitments of each party to the other set forth in this Agreement, and for other good and valuable consideration the sufficiency and receipt of which is hereby acknowledged, agree as follows:

**1       DEFINITIONS AND INTERPRETATION**

1.1       In this document the following definitions will apply:

**Affiliate** means any Person or entity which Controls, is Controlled by or is under common Control with another Person or entity; as to Franchisee, Affiliate also includes any director, officer or owner of any interest in the Franchisee (and any entity Controlled by any of the foregoing).

**Agreement** means this License Agreement.

**Approved Suppliers** means suppliers that have entered into the Licensee's then-current Approved Supplier Agreement and which include, for the avoidance of doubt and without limitation, Suppliers Wholesalers and Affiliates.

**Approved Supplier Agreement** means Licensee's then-current agreement with suppliers to sell Products and Services to customers and Franchisees in connection with the US Business.

**Business** means the establishment and operation of Cartridge World businesses in the Territory pursuant to the System at street fronts, malls, and other retail and commercial premises (the "Stores"), that sell Products and Services to clients and customers at the Stores as well as via E-Commerce and by direct sales representation and marketing to business owners in their homes and business premises.

**Business Plan** means a business plan produced by the Licensee for the License Business, in the form and covering the areas reasonably required by the Licensor from time to time.

**Computer Software** means the computer software, applications and hardware used to operate the System and access the Website and the Intranet including those referred to in Exhibit C.

**Commencement Date** means the date of commencement of this Agreement.

**Confidential Material** includes all information (written, oral, electronic or otherwise) provided by, relating to, or originating from a party ("the Disclosing Party") or any Affiliate of the Disclosing Party in relation to the Disclosing Party, this Agreement, and any disclosure provided by the Disclosing Party during the Term, except:

(a) any Information which is in the public domain at the time of provision or disclosure to the other party, or which subsequently arises in the public domain through no breach of the Agreement by either party or any of their employees, agents or representatives;

(b) is required to be disclosed by either party by law;

(c) is independently developed by the receiving party without reference to or reliance upon information provided by the Disclosing Party; or

(d) the Disclosing Party agrees in writing it may be disclosed.

**Control** means the ability to direct the management or policies, and/or appoint a majority of the directors on the board, directly or indirectly. This ability whether through the ownership of shares or other securities, by contract or otherwise, provided in all events, the direct or indirect ownership of more than fifty percent (50%) of the voting share capital, and/or right to receive more than fifty percent (50%) of distributions on account of ownership of equity share capital, shall be deemed to constitute "Control."

**Damages** means all claims, demands, causes of action, suits, damages, liabilities, fines, penalties, assessments, judgments, losses, and expenses (including expenses, costs and lawyers' fees incurred for any indemnified party's primary defense or for enforcement of its indemnification rights).

**Designated Equipment** means equipment which meets the Licensee's then-current requirements or is otherwise approved by Licensee, and which must be obtained and used in the operation of the License Business and the Stores.

**Designated Individual** means the Person who shall be at all times the chief executive who is responsible for the management of the License Business and approved by the Licensor.

**Domain Name(s)** means all URL(s) registered and/or used in connection with the Business and System in the Territory including (without limitation) those specified in Exhibit A and any URL registered by the Licensor in addition to or in substitution for it in the Territory excepting www.cartridgeworld.com.

**E-Commerce** means the sale of Products and other related transactions via the internet (whether via the Website or other means).

**Email Account** means an email account using an approved Cartridge World domain as specified by the Licensor.

**Finished Goods** means ink and toner cartridges manufactured or remanufactured in Cartridge World approved manufacturing facilities (which shall include any and all manufacturing facilities owned or operated by the Licensee) and packaged in Cartridge World branded packaging.

**Force Majeure Event** means any event, series of events, crisis, trend or state of affairs whatsoever, in any part of the world, which is or are beyond the reasonable control of the affected party. This includes, without prejudice to the generality of the foregoing, the following: war or civil war (whether declared or not), other hostilities (including terrorism, sabotage, vandalism, riot, insurrection, revolution or other civil commotion), international or domestic political crisis or tension, explosion, bombing, labour disputes, strikes, lockout, action or omission by any governmental authority, epidemic or quarantine restrictions, inability to obtain labour or materials, fire, flood, storm, earthquake, hurricanes, tornado, drought, disease or other acts of God which has a direct, material and significant impact on the affected party to perform its obligations under this Agreement; provided however, that Force Majeure Event does not include mere shortage of material, equipment, labour or supplies unique to the affected party, or a party's own inability to obtain financing or permits, or other events unique to the affected party.

**Franchise Agreement** means the Master Franchise Agreement and the Unit Franchise Agreement, as applicable.

**Franchisee Marketing Fund Contributions** means the amount payable by a Franchisee to the Marketing Fund pursuant to the applicable Franchise Agreement.

**Gross Revenue** means all revenue from sales of Products and Services in the Territory received by the Licensee from the License Business.

**Intellectual Property** includes all intellectual property associated with or related to the System, Business, and Operation Manual(s) including, without limitation, all registered and unregistered (common law) Marks, Domain Names, copyrights and work product (including, without limitation, moral rights), patents and patent disclosures, technology, know-how, and data, processes, inventions, Computer Software, the Website(s), the System, trade secrets and any secret process or Confidential Information and proprietary rights owned, created, and developed by or for the Licensor and all associated rights, interest, and goodwill therein and thereto.

**Law** means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, or other requirement of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

**Marketing Fund** means the aggregate amount of Franchisee Marketing Fund Contributions.

**Mark(s)** means all registered and unregistered trademarks, service marks, brand and corporate names (including, without limitation, the Names), product and services

names, slogans, taglines, designs and logos, and trade dress (including, without limitation, colour schemes) associated with or related to the System, Business, and Operation Manual(s), including, without limitation, those listed in Exhibit B or as otherwise advised in writing by the Licensor.

**Master Franchise Agreement** means a form of agreement approved by the Licensee and entered into between Licensee and Master Franchisees for the purpose of creating and operating Master Franchises.

**Names(s)** means "Cartridge World" or such other associated name or names, including those names incorporating the words "Cartridge World" and the Cartridge World logo.

**Operations Manual** means the policies and procedures, whether available in electronic or hard copy format, documented by the Licensor and lent or made available to the Licensee or its Franchisees by the Licensor relating to the conduct of the Business. Amendments, variations, deletions or additions made to the Operations Manual by the Licensor during the Term or any Renewal Term of this Agreement are also included. Where relevant, the term will include any Master Franchisee or Unit Franchisee Operations Manual.

**Person** means an individual, corporation, partnership, joint venture, limited liability entity, governmental authority, unincorporated organization, trust, association, or other entity.

**Premises** means any building from which the Master Franchisee or Unit Franchisee conducts its business under the Master Franchise Agreement, a Unit Franchise Agreement or related Agreement in the Territory.

**Products** means all items used or sold in connection with the System, including printers, printer repairs and servicing, Finished Goods, paper, printers and copiers, printer and copier repairs and service, ink and/or toner cartridges, copier and printer paper, and such additional related products as the Licensee may reasonably determine from time to time.

**Purchase Price** means the amounts received for tangible and intangible assets (including stock) in relation to the sale or transfer of any corporate or franchised Store or the Master Franchisee's Business.

**Renewal Fee** means the renewal fee payable as a condition of the exercise of rights provided in Clause 4, as specified in Exhibit A.

**Renewal Term** means the term of any renewal exercised pursuant to Clause 4 for the period or periods set out in Exhibit A.

**Services** means all services provided in connection with or sold pursuant to the System or the License Business, including, without limitation, the supply, monitoring, repair and service of printers and copiers, the reloading, remanufacture and refilling of Cartridges and Products for use by business and domestic customers, the sale of copier and printer paper, paper shredding, recycling and recharging of Cartridges and all other services included in or contemplated for use in connection with the System or as the Licensee may reasonably determine from time to time.

**System** means the business system developed and amended from time to time by the Licensor and/or its predecessors, for the business of providing advice on, and selling both from the Stores, via E-Commerce and by direct sales representation and marketing to business owners in their premises, Products and Services, as well as the marketing and sale of Products and Services and associated products and incorporates Intellectual Property and Confidential Information.

**System Assets** means all assets and resources used, necessary and/or useful in connection with the establishment and operation of the Business and the System, including, without limitation, the Intellectual Property, all books and records relating to the operation of the License Business prior to the date hereof and the following:

- The business name 'Cartridge World' and 'Cartridge World Print Services';
- All Marks, including trade names, slogans, service marks, trademarks and logos for which registration has been obtained, or being used in the Territory and elsewhere;
- Specially designed building or facility, with specially developed signage, distinctive interior and exterior design, colour schemes and accessories;
- Marketing concepts and promotional programs;
- Operations Manuals;
- Distinctive packaging and uniforms bearing the 'Cartridge World' logo and other Marks;
- Computer Software to enable client access to ordering, computer monitoring via Print Fleet, and dealings with information presented on the Website;
- An Intranet site compiled through the use of the Computer Software;
- All Domain Names;
- Procedures for operations, management and training; and Methods of operating including the sourcing and purchase of Products.

**Term** means the period of thirty (30) years from the Commencement Date.

**Territory** means the geographical area as defined in Exhibit A.

**Training Program** means the training program (including both initial and ongoing training programs) established in accordance with the Licensor's then-current training requirements, by the Master Franchisee for its Unit Franchisees and employees.

**Unit Franchisee** means a Person(s) granted a Unit Franchise either Retail or Executive Office Model within the Territory.

**Unit Franchise Agreement** means a form of agreement approved by the Licensee and entered into between Licensee and Unit Franchisees for the purpose of creating and operating Unit Franchises.

**US Business** means the business operated by the Licensee using the System in the Territory.

**Website** means the location of the System on the Internet and Intranet through the use of the World Wide Web.

1.2     Interpretation.  In this Agreement, unless the context otherwise requires:

1.2.1     references to Clauses and Exhibits are to the clauses and exhibits of this Agreement;

1.2.2     the headings are for convenience only and shall not affect its interpretation;

1.2.3     words denoting Persons include individuals, bodies corporate and unincorporated associations of Persons;

1.2.4     references to a Person include that Person's legal Personal representatives, successors and permitted assigns;

1.2.5     references to the singular number shall include references to the plural number and vice versa;

1.2.6     words denoting one gender shall include all genders;

1.2.7     any reference in this Agreement to a statutory provision shall include that provision and any regulation made in pursuance thereof and any modification or re-enactment thereof from time to time, whether before or after the date of this Agreement;

1.2.8     a reference to any agreement is a reference to that agreement and all exhibits, schedules, appendices and the like incorporated therein, as the same may be amended, modified, supplemented, waived, varied, added to, substituted, replaced, renewed or extended from time to time;

1.2.9     the terms "include," "including," and "among/amongst other things" shall be deemed to be followed by the words "without limitation" or "but not limited to," whether or not so followed;

1.2.10     the words "will," "shall," and "must" in this Agreement indicate a mandatory obligation;

1.2.11     all dollar amounts set forth in this Agreement are stated in the Payment Currency, unless otherwise specified;

1.2.12     the words "day" and "days" refer to calendar days (in a Gregorian calendar) unless otherwise stated; provided that when any number of period of days referred to in this Agreement ends or expires on a weekend or legal holiday in the Territory, the number or period of days should be extended to the next following day which is not on a weekend or a legal holiday in the Territory. The words "month" and "months" refer to calendar months unless otherwise stated;

1.2.13     the words "hereof", "hereto" and "herein" refer to this Agreement, and are not limited to the article, section, paragraph or clause in which such words are used;

1.2.14     a reference to "writing" includes printing, typing, lithography and other means of reproducing words in a visible form (including by any electronic means); and

1.2.15     a reference to a capitalized term as defined in another executed agreement shall be to such term as defined therein whether or not such other agreement is then in effect.

## 2    GRANT

2.1    Grant. The Licensor hereby grants to the Licensee the exclusive, irrevocable, transferable, right and license in the Territory to:

- establish and operate the US Business using the System and all System Assets;

- identify and operate the License Business in accordance with the System;

- grant Master Franchises

- grant Unit Franchises

- collect royalties and advertising levies

- receive rebates from Suppliers

- use the Intellectual Property;

- use the Approved Name;
- access the telephone numbers
- determine distribution channels including online sales of products and services
- appoint Approved Suppliers, and;
- access the Website, Domain Name and Email Accounts

On the following terms and conditions:

2.1.1   The Licensee will operate the System in its own right and grant Franchises to Franchisees to operate the System.

2.1.2   The Licensee will only enter into Franchise Agreements with Persons who are responsible and of good character, financially substantial and competent to operate a Franchise, who meet reasonable selection criteria and who shall complete a training program.

2.1.3   The Licensee shall hire and retain sufficient franchise operations support staff to induct, train and support Franchisees to apply the System.

2.1.4   The Licensee must screen potential Master Franchisees within the Territory and in particular, but without limiting the generality of the foregoing, the Licensee must:

    (a)   Conduct such investigations of all potential Franchisees as may be reasonably necessary to determine if those applicants are capable of acquiring and operating a Master Franchise; and

    (b)   The Licensee must not permit any Person to use any Mark or element of the System, unless and until they have executed a Master or Unit Franchise Agreement in accordance with this Agreement.

2.2   No Solicitation Outside the Territory. The Licensee shall not solicit Unit Franchisees or conduct the License Business outside of the Territory. The Licensee shall refer to The Licensor all inquiries from prospective Franchisees located outside the Territory.

2.3   Exclusivity. During the Term, the Licensor shall not establish or operate, or license or permit, any other Person to establish or operate, the System, the License Business, Franchises or Stores in the Territory or otherwise engage in the License Business (or any business in competition therewith) in the Territory. The Licensor acknowledges that a breach by the Licensor of this Clause 2.3 may cause the Licensee irreparable harm, for which an award of damages would not be adequate compensation and agrees that, in the event of such a breach or threatened breach, the Licensee will be entitled to equitable relief, including in the form of orders for preliminary or permanent injunction, specific performance, and any other relief that may be available from any court, and the parties hereby waive any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection with such relief. These remedies will not be deemed to be exclusive but are in addition to all other remedies available under this Agreement at Law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary. The Licensor retains all other rights not expressly granted to the Licensee in this clause.

**3**       **TERM**

**3.1**     Term of the Agreement.  This Agreement shall commence on the Commencement Date and shall expire on the thirtieth (30th) anniversary of such date (the "**Initial Term**") unless sooner terminated in accordance with this Agreement or renewed in accordance with Clause 4 of this Agreement.

**3.2**     As used in this Agreement, the expressions "Term" or "Term of this Agreement" shall mean the Initial Term and the Renewal Term if this Agreement is renewed in accordance therewith.

**4**       **RENEWAL**

**4.1**     Renewal Term.  The Licensor hereby grants to the Licensee an option to renew this Agreement for one additional term of fifteen (15) years (the "Renewal Term"), with the Renewal Term beginning on the expiration of the Initial Term provided that the Licensee is not in breach of this Agreement as of the date of such renewal.

**4.2**     Time for Renewal and Renewal Fee. Any exercise of the options granted under this Clause 4 must be preceded by the Licensee providing written notice to the Licensor requesting the renewal option at least fifteen (15) months prior to the end of the Term. In connection with any renewal of this Agreement, Licensee shall pay Licensor the Renewal Fee.

**5**       **PRODUCT**

**5.1**     Use and Purchase of Product.

    **5.1.1**    During the Term the Licensee must use its commercially reasonable endeavors to offer for sale Cartridge World brand Finished Goods and Services and Product from suppliers that are approved by the Licensee and have entered into an Approved Supplier Agreement.

    **5.1.2**    The Licensee must use its commercially reasonable endeavors to ensure that the Licensee and Franchisees only purchase and offer for sale Products that do not infringe on the intellectual property rights of any third party.

**5.2**     Directions. The Licensee shall consider in good faith any reasonable directions of the Licensor to discontinue a specific product used or sold in the System or cease using or approving a supplier of Products to the System provided that Licensee shall be under no obligation to follow or implement any such directions.

**6**       **MONIES PAYABLE BY THE LICENSEE**

**6.1**     Payment Amounts.

    **6.1.1**    US License Fee. In consideration of the rights granted herein, and the continued opportunity of the Licensee to operate the License Business the Licensee shall pay to the Licensor an initial fee in the amount specified in Item 8 in Exhibit A  by wire transfer of immediately available funds to an account specified by the Licensor on or before the Commencement Date.

    **6.1.2**    Additional License Fee. Where annual Gross Revenue exceeds $60 Million during any calendar year of the Term, the Licensee shall pay to the Licensor an Additional License Fee in the amount specified in Item 10 on Exhibit A by wire transfer of immediately available funds to an account specified by the Licensor by the date specified in Item 10 Exhibit A.

**6.2**     Payment Method.  All payments due under this Agreement shall be paid in the Payment Currency and on the payment dates specified in Exhibit A by wire transfer to the bank account specified by the Licensor and shall be deemed fully earned and non-refundable upon receipt.

**6.3**     Interest.  Any payment not actually received by the Licensor on or before the date specified in this Agreement shall be deemed overdue.  If any payment is overdue, the Licensee shall pay the Licensor, in addition to the overdue amount, interest on such amount from the due date until paid, at the rate of one and one half percent (1.5%) per annum, but not more than the maximum rate permitted by law (if any).

**7**      **LICENSOR'S DUTIES**

**7.1**     The Licensor covenants and agrees with the Licensee to provide access to the materials and introductions detailed in Clauses 7.1.1 to 7.1.10 used in connection with the Business or the System on the Commencement Date. The Licensor covenants and agrees with the Licensee to provide, at the Licensee's request and expense, if any, access to any developments in or updates to the materials listed in Clauses 7.1.1 to 7.1.10 which occur after the Commencement Date.

      **7.1.1**   Intellectual Property.   All Intellectual Property and know-how used in connection with the System and owned by the Licensor and all materials relating thereto.

      **7.1.2**   Supplier Introductions.   Introductions to suppliers currently operating or involved in the Business in the Territory and all files, information and other materials in respect of such suppliers in the possession of the Licensor or its Affiliates.

      **7.1.3**   Franchisee Introductions.  Introductions to Franchisees currently operating or involved in the Business in the Territory and all files, information and other materials in respect of such Franchisees in the possession of the Licensor or its Affiliates.

      **7.1.4**   Training Material. Training materials developed by the Licensor or its Affiliates in connection with the System and access to any training activities conducted by Licensor or its Affiliates.

      **7.1.5**   Franchise Agreements.  Standard draft form Franchise Agreements current at as of the Commencement Date which the Licensee may modify in its discretion from time to time–, provided such Franchise Agreements, as modified comply with applicable Laws.

      **7.1.6**   Franchisee Materials.  All disclosure documents, manuals, records, files and all other materials and all copies thereof in the Licensor's possession related to the License Business.

      **7.1.7**   Marketing and Advertising Material. Marketing and advertising material currently used in connection with the System.

      **7.1.8**   Approved Name. Give its approval to the Licensee carrying on the License Business under the Approved Name.

      **7.1.9**   Website. Website, Intranet and Domain Name in the License Business.

      **7.1.10**  Operations Manuals.  All Operations Manuals.

**7.2**     Inspections.  The Licensor shall have the right, upon reasonable notice at its sole expense and subject always to maintaining the Licensee's quiet enjoyment of the License granted under this Agreement and not unreasonably disrupting the operation of the License Business during normal and posted operating hours, to conduct inspections of the business premises operated under this Agreement by the Licensee and observe the Licensee's conduct of the License Business, including promotional, training, and service efforts (which may include contacting the Licensee personnel and prospective and existing Master and Unit Franchisees, removing samples for testing and analysing, and monitoring training programs and sales presentations by the Licensee's personnel) provided that the Licensor shall not conduct any such inspection more than once per calendar year.  If the Licensor finds any deficiencies in the operation of the Business during any inspection, the Licensor can make, and Licensee shall consider in good faith, reasonable recommendations to correct such deficiencies.

**7.3**     Development of the System.  The Licensor shall have the right to recommend change, alteration or modification from time to time, of any aspect of the System, including the terms of Franchise Agreements offered to prospective Franchisees, Store format, trade dress, colours and designs used in connection with the System, and any systems, procedures, methods, standards, specifications, lists, programs, techniques and concepts used in connection with the System and Licensee shall consider in good faith, implementation of such recommendations.

**7.4**     Delegation of the Licensor's Duties.  The Licensee acknowledges and agrees that any designee, employee, regional office, contractor or agent of the Licensor may perform any duty or obligation imposed on the Licensor by this Agreement, as the Licensor may designate provided that any such delegation shall relieve the Licensor of any obligation or liabilities hereunder.

**7.5**     Compliance with Laws.  The Licensor shall comply with all applicable Laws in respect of the performance of its obligations hereunder and shall obtain in a timely manner at its own cost any and all government approvals and/or registrations necessary in connection therewith.  The Licensee hereby represents and warrants to the Licensee that, prior to the date hereof, it has conducted its operations (including the System, the License Business, its use and operation of the Intellectual Property and its agreements and relationships with Franchisees) in compliance with all applicable Laws.

**7.6**     Good Faith. To act in good faith at all times to the Licensee and its Affiliates and Franchisees and forthwith provide, at the Licensee's cost, such commercially reasonable assistance and co-operation as may be practical including upon a reasonable request by the Licensee.

**8**       **LICENSEE'S DUTIES**

The Licensee agrees with the Licensor as follows:

**8.1**     Compliance by Licensee.  The Licensee understands and acknowledges that every detail of the System is important to the Licensor, the Licensee, Franchisees and other Licensees and Master Franchisees, in order to develop and maintain high and uniform operating standards, to increase the demand for Products and Services, and to protect the reputation and goodwill of the Licensor and the System. The Licensee shall use its commercially reasonable endeavors to have the Master Franchisees operate their businesses in accordance with the standards and specifications set forth in the Franchise Agreements and Operations Manuals and agrees to;

8.1.1    carry on, promote and conduct the Licensed Business in a proper and efficient manner. The Licensee must employ the number of qualified support staff reasonably required to achieve the objectives in this Agreement;

8.1.2    liaise, on a regular basis with any Franchisee appointed in the Territory and provide to the same all assistance, supervision and other support as is required by the relevant Franchise Agreement or the Operations Manual;

8.1.3    use its commercially reasonable endeavors to cause all Franchisees to faithfully and fully observe the terms and obligations in their respective Franchise Agreements and the Licensee shall fulfil all of the duties of the franchisor under each Master Franchise Agreement and shall maintain compliance by each Master Franchisee under, and enforce, each Master Franchise Agreement according to the terms and conditions thereof;

8.1.4    upon the Licensor's reasonable request provide information on any Suppliers, Product or Services, fixtures, furnishings, signs, equipment, interior or exterior design or methods of operation and any advertising or marketing materials, or any other materials using the Marks or identifying the System used by the Licensee;

8.2    Business Plan. To prepare and deliver to the Licensor a Business Plan in a format acceptable to the Licensor thirty days in advance of each calendar year of the Term and if requested by the Licensor to review the Business Plan with the Licensor.

8.3    Training Programs. The Licensee shall establish both initial and ongoing Training Programs and such other courses, seminars, and training programs for the Unit and Master Franchisees and their employees as may be necessary from time to time.

8.4    Facilitate Conferences.    The Licensee must facilitate a US conference with its Franchisees at least every two years.

8.5    Attend Conferences. The Licensor may require that representatives of the Licensee attend up to two (2) regional or global conferences per calendar year at a location selected by the Licensor.  The Licensee will be responsible for all its own expenses associated with the conference(s) in addition to its own travel and accommodation expenses.

8.6    Supervise Master Franchisees. The Licensee shall ensure each Master Franchisee in the Territory fulfils its obligations under its Master Franchise Agreement and provide such periodic assistance to the Master Franchisees as required in the Master Franchise Agreements including:

8.6.1    conducting regular group or individual meetings with Master Franchisees

8.6.2    providing on-going sales and technical support to the Master Franchisees; and

8.6.3    obtain within ninety (90) days from the end of each financial year an annual profit & loss and balance sheet for the prior year from each Master Franchisee and provide such documents to the Licensor upon request.

8.7    Products and Services.    The Licensee shall use its commercially reasonable endeavors to ensure that the Stores in the Territory will offer courteous and efficient service and a pleasant atmosphere and will offer for sale only the Products and Services (including promotional items) that the Licensee approves.

8.8     Sourcing.  The Licensee shall use its commercially reasonable endeavors to ensure that all Franchisees in the Territory purchase Products and Designated Equipment from Approved Suppliers which include Finished Goods supplied by the Cartridge World Global Procurement Centre. The Licensor is not responsible for negotiating the terms of any relationship the Licensee chooses to establish with any such suppliers. The Licensee may designate single or multiple suppliers for any given item, Service or Product, and may designate the Licensee or one or more of its Affiliates as an exclusive Approved Supplier for certain Products or Services.

8.9     Responsibility for Personnel. The Licensee agrees to assure that all its employees maintain the highest quality standards of professionalism and integrity.  The Licensee shall comply, and ensure that its employees comply, with all applicable Laws. The Licensee agrees to be responsible for the training of its Designated Individual and other employees and to pay and bear all relevant taxes, levies rates, insurance premiums, statutory obligations and charges imposed concerning those Persons.

8.10    Compliance with Laws.  The Licensee shall comply with all applicable Laws relating to the licensing of trademarks, the offer and sale of Franchises and the termination of Franchise Agreements and shall obtain in a timely manner at its own cost any and all government approvals and/or registrations necessary for the full and proper conduct of the License Business. The Licensor shall provide, at the Licensees cost, any commercially reasonable assistance that is reasonably necessary for the Licensee to comply herewith.

8.11    Maintaining Master Records. The Licensee must create and maintain reasonable support records in relation to the Franchisees.  Such records must contain copies of any material agreements, correspondence, newsletters or other information sent or received by the Licensee to or from Franchisees in the Territory.

8.12    Reporting.  The Licensee shall upon the reasonable request by the Licensor provide written reports of information concerning the Cartridge World US License Business, Master or Unit Franchisees and Stores and E-Commerce sales or any other reports reasonably requested by the Licensor. The Licensee shall allow the Licensor reasonable access to the records described in Clause 8.11 in accordance with and subject to the terms of Clause 7.2

8.13    Operate as Independent Proprietor. To conduct the License Business as an independent contractor under the Approved Name at its sole risk and expense and for its sole benefit and not as a representative, agent, partner, joint ventures or employee of the Licensor.   The Licensee does not have the authority (expressed or implied) to represent, act on behalf of or by any other means bind the Licensor except as expressly provided for in this Agreement.  The Licensor has no authority (express or implied) to represent, act on behalf of or by any other means bind the Licensee except as expressly provided in this Agreement.

8.14    Approved Name. The Licensee agrees upon executing this Agreement:

        8.14.1    to consider in good faith any reasonable direction given by the Licensor as to the alteration or discontinuance of its Approved Name so as to thereafter be known by a new name associated with the System;

        8.14.2    to not trade or seek to register and trade under any business name (with the exception of the Approved Name) in the Territory without first obtaining the

prior written consent of the Licensor as to the content and style of such business name, such consent not to be unreasonably withheld;

8.14.3   In the event that the Licensee registers a business name or Trade Mark related to the License Business, it shall transfer all rights in such name to the Licensor upon termination or expiration of this Agreement.

8.15   Marks. Not to contest or challenge in any legal proceedings or otherwise the Licensor's proprietorship or rights to use any of the Marks, Confidential Information, Intellectual Property or any other matter making up the System and to inform the Licensor of any infringement or threatened infringement of the Licensor's proprietorship or rights to use any of the  Confidential Information of the Licensor or the Intellectual Property that comes into the Licensee's knowledge and assist the Licensor, as reasonably directed by the Licensor and at the Licensor's expense, in defending any such infringement or threatened infringement.

8.16   Advertising. To manage the Marketing Fund in the best interests of the Franchisees, the Licensee and the License Business in the Territory and establish and hold regular meetings seek the views of Franchisees in the conduct of such advertising.

8.17   Advice. To inform the Licensor of any new developments that may assist the development of the System inside or outside the Territory.

8.18   Good Faith. To act in good faith at all times to the Licensor and Franchisees and forthwith provide at the Licensor's cost, such commercial assistance and co-operation as may be practical including upon a reasonable request by the Licensor.

8.19   License Back.  The Licensee agrees to disclose to the Licensor any ideas, concepts, methods, techniques and products ("**Developments**") conceived or developed by the Licensee and its Affiliates, owners, employees, contractors or agents engaged in the operation of the License Business or any Franchisee during the Term relating solely to the development and/or operation of the License Business (the "**Licensed Business Developments**"); provided, that "Licensed Business Developments" shall not include any Developments to the extent they are conceived or developed by the Licensee, its Affiliates, owners, employees, contractors, agents or any Franchisee in respect of any business or operation of the Licensee other than the License Business.

The Licensee hereby grants to the Licensor and agrees to procure from its Affiliates, owners, employees, contractors, agents and Franchisees a perpetual, non-exclusive, and worldwide right to use any Licensed Business Developments.  The Licensor shall have no obligation to make any payments to the Licensee with respect to any Licensed Business Developments.  The Licensee agrees that the Licensee will not use or allow any other person or entity to use any Licensed Business Development without obtaining the Licensor's prior written approval; provided, that the Licensee may assign or license the Licensed Business Developments to its Affiliates and subsidiaries without the Licensor's consent.

8.20   To Pay Accounts of the License Business. To pay promptly as when they fall due all accounts received by the Licensee pertaining to the License Business and use its commercially reasonable efforts to ensure the Franchisees within the Territory comply with their payment obligations.

8.21   Licensor Right to Enforce. If the Licensee fails to carry out its obligations under any Franchise Agreement within the time provided in the Franchise Agreement (or, if no time is specified, within a reasonable time) and in a manner consistent with the terms

of the Franchise Agreement, the Licensor may itself take such steps as may be necessary to enforce the terms and conditions of each Franchise Agreement. The Licensee shall cooperate with the Licensor to give effect to this Clause, including providing and executing such documents as may be deemed necessary by the Licensor in order to give effect to this Clause.

8.22    Tax. To pay any government impost, duty, levy or tax howsoever arising from the conduct of the License Business by the Licensee.

8.23    Franchisees. To use commercially reasonable efforts to ensure that:

8.23.1   each Franchisee in the Territory observes the terms of the Franchise Agreement; and

8.23.2   in the event of a breach by a Franchisee of a Franchise Agreement, the Licensee takes appropriate action to cause the Franchisee to remedy the same and takes all appropriate remedial action lawfully available to the Licensee pursuant to the Franchise Agreement in respect of the breach until the breach has been remedied;

8.24    Email Accounts, Website, E-Commerce and Ownership of Data. To comply with all obligations imposed in Exhibit C.

8.25    Franchise Meetings. To convene or cause to have meetings convened of Franchisees on a regular but no less than a quarterly basis.

8.26    Hotline. To maintain a telephone service for enquiries by Franchisees on Business Days during normal business hours.

8.27    Information Technology. To comply with all obligations imposed on it in Exhibit C and promptly comply with all directions in relation to upgrade of information technology (including Point-of-Sale systems) and require the Franchisees to comply with all such requirements where required by the Licensor.

8.28    Marketing Fund.

8.28.1   **Bank Accounts**. The Licensee shall establish a bank account to hold the Marketing Fund (the "Account");

8.28.2   **Advertising Levy**. The Licensee will collect the Franchisee Marketing Fund Contributions from the applicable Franchisees and hold the Advertising Levy in the account for the purposes of promoting the License Business;

8.28.3   **Purpose**. All deposits in the Account will be used by the Licensee for the purposes of advertising the License Business and the payment of marketing, agency fees, and reasonable overheads, personnel and administration costs which the Licensee may incur in connection with the conduct of such advertising and administration of the Account;

8.28.4   **Accounting**. The Licensee agrees to provide to the Franchisees an annual accounting of its use of the funds received in the Account.

9       **FINANCIAL REPORTING**

9.1     Keep Books. The Licensee shall maintain for the Term and any Renewal Term and for a period of five (5) years after termination or expiration of this Agreement, a full, complete, and accurate set of accounts ("**Books**") and proper records relevant to the

License Business in accordance with generally accepted accounting principles and in the form and manner prescribed by the Licensor from time to time in writing.

**9.2**  To Permit Inspection. Subject to, and in accordance with Section 7.2, during the Term and any Renewal Term and for a period of five (5) years after termination or expiration of this Agreement, to permit the Licensor access to the Books.

**9.3**  Quarterly Statements. The Licensee shall submit to the Licensor Quarterly reports in a format reasonably specified by the Licensor by the fifteenth (15th) day of January, April, July and October for the preceding Quarter during the Term.

**9.4**  Annual Financial Statements. The Licensee shall, at its expense, provide to the Licensor, in a format reasonably specified by the Licensor, true copies of the annual financial statements for the License Business (prepared in accordance with generally accepted accounting principles, and including a year-end balance sheet, income statement and profit and loss statement, no later than one hundred and twenty (120) days after the end of each financial year.

**9.5**  Records. The Licensee shall also submit to the Licensor such other invoices, statements, copies of receipts, forms, reports and such other documents and reports in a format specified by the Licensor as and when the Licensor may reasonably require regarding the US Business.

**10**  **RESTRICTIONS WHERE LICENSEE IS TRUSTEE OR TRUST**

**10.1**  In the event that the Licensee holds this Agreement in the capacity of trustee of a trust which has been disclosed and approved by the Licensor prior to its execution, the Licensee must not during the Term any Renewal Term:

**10.1.1**  vary, amend, alter, revoke or modify the provisions or powers contained in the trust deed constituting the said trust;

**10.1.2**  distribute or join in the distribution of any or all of the capital of the trust fund; or

**10.1.3**  resign office as trustee;

without the prior written approval of the Licensor which must not be unreasonably withheld.

**11**  **LEGAL COSTS**

**11.1**  Each party must bear its own costs arising out of the negotiation, preparation and execution of this Agreement.

**12**  **INDEMNITY**

**12.1**  The Licensee covenants and agrees that from the Commencement Date it will assume the sole and entire responsibility for the License Business following the Commencement Date and indemnify and save harmless the Licensor from any and all claims, liabilities, losses, expenses, responsibility and damages by reason of any claim, proceedings, action, liability or injury arising out of the Licensee's conduct of the License Business or because of any breach of this Agreement by the Licensee.

**12.2**  Each party (the "Indemnifying Party") hereby covenants and agrees that it will indemnify, defend and hold harmless the other party and its Affiliates and their respective officers, directors, employees, agents, permitted successors and permitted assigns (the "Indemnified Parties") from any and all Damages incurred by any

Indemnified Party to the extent arising from any claim, proceedings, action, liability or injury arising out of (a) the Indemnifying Party's breach of this Agreement or (b) the willful misconduct or gross negligence of the Indemnifying Party.

12.3 Licensor shall indemnify, defend and hold Licensee and its Affiliates and their respective officers, directors, employees, agents, permitted successors and permitted assigns harmless from all Damages arising from or relating in any way to (a) any claim or action alleging that any of the Intellectual Property infringes or otherwise violates the intellectual property rights of any person and (b) the Licensor's (or any of its Affiliates') operation of the System, the License Business, its use and operation of the Intellectual Property and its agreements and relationships with Franchisees prior to the Commencement Date.

12.4 The Indemnifying Party is not required to indemnify the Indemnified Party for any Damages to extent caused by the negligent act or omission of any Indemnified Party. In addition, the Licensee shall not be required to indemnify the Licensor for Damages to the extent that such Damages arose as a direct result of actions taken by Licensee in accordance with this License Agreement, the Operations Manual and or any other written instructions of the Licensor.

12.5 The Licensee is not required to indemnify and save harmless the Licensor for any claim, proceeding, action, liability or injury which is due to some negligent act or omission of the Licensor or any act of the Licensee when the Licensee is acting in accordance with this Agreement, Operations Manual or other directions of the Licensor whether oral or written.

13 OWNERSHIP OF INTELLECTUAL PROPERTY

13.1 Ownership of the Intellectual Property. The Licensee acknowledges that the Licensor is the exclusive owner of the Intellectual Property including without limitation, the Marks.

13.2 No Rights Created in the Licensee. The use of any or all of the Intellectual Property will not create in the Licensee or in any person any right, title or interest in or to any of it except as expressly provided in this Agreement.

13.3 Not to Assert Conflicting Interests. The Licensee must not directly or indirectly assert any right, title or interest in or to any of the Marks or any other part of the Intellectual Property other than as provided for in this Agreement.

13.4 Licensor's Representations. The Marks that are licensed to the Licensee for use in the Territory are those covered by this Agreement including, without limitation, those listed in Exhibit B. The Licensor represents that the Licensor has all necessary rights to grant the license to the Licensee, and that, the Licensee's use of the Marks in accordance with this Agreement does not infringe the intellectual property rights of any other person. Except as set forth in this Agreement, the Licensor makes no other representation or warranty about the Marks.

13.5 Licensee's Obligations regarding Marks. With respect to the Licensee's use of the Marks, the Licensee agrees that:

13.5.1 The Licensee shall use the Marks only in the manner authorized and permitted by this Agreement which shall include, the right to provide suppliers the right to use the Marks pursuant to the Approved Supplier Agreement provided always that such suppliers do not distribute any products using the Marks outside the Territory without the written permission of the Licensor.

**13.5.2**    The Licensee shall use the Marks only for the operation of the License Business contemplated hereunder which shall include the right to license to the Franchisees the right to use the Marks pursuant to the Franchise Agreements.

**13.5.3**    During the Term of this Agreement and any Renewal Term, the Licensee shall identify itself as deemed reasonably necessary, as the owner of the License Business in conjunction with any use of the Marks, including uses on invoices, order forms, receipts, and contracts, as well as the display of a notice in such content and form as required by Law

**13.5.4**    The Licensee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute a violation of the Licensor's rights.

**13.5.5**    The Licensee shall not use the Marks to incur any obligation or indebtedness on behalf of the Licensor.

**13.5.6**    The Licensee shall not use the Marks as part of its corporate or other legal name, telephone number, or as part of any e-mail address, domain name, or other identification of the Licensee in any electronic medium other than in accordance with this Agreement but may use the Marks as part of an assumed trade name.

**13.5.7**    The Licensee agrees to execute any documents deemed reasonably necessary by the Licensor or the Licensor's counsel to obtain protection for the Marks or to maintain their continued validity and enforceability, including as a registered user under this Agreement and provide Licensor (upon its reasonable written request) with any such required registered user documentation that is filed with the Territory's applicable governmental authority. The Licensee shall be responsible for the costs associated with the filing of any required registered user documents for this Agreement with any applicable Territory's Trademark Office or other governmental authority, and of any renewal, amendment, cancellation or withdrawal of such registration thereafter.  If necessary, the Licensor will appoint and empower the Licensee as its true and lawful attorney-in-fact to execute and deliver on its behalf any document necessary for filing of such registered user documents or obtaining the registration of this Agreement, as applicable, or any renewal, amendment or cancellation of such registration. The Licensee shall be responsible for complying with any applicable present or future filings or procedures imposed by the Laws of the Territory in connection with the validity of this Agreement.

**13.5.8**    The Licensee shall promptly execute, and require the Unit Franchisees to execute, and deliver to the Licensor any documents deemed reasonably necessary by the Licensor to obtain protection for the Marks or to maintain the continued validity and enforceability of the Marks and the license contained in this Agreement.

**13.5.9**    With respect to litigation involving the Marks, the parties agree that:

The Licensee shall promptly notify the Licensor of any suspected infringement or unauthorized use of, any known challenge to the validity of, or any known challenge to the Licensor's ownership of, or the Licensee's right to use, the Marks licensed hereunder.  The Licensee acknowledges that

the Licensor shall have the sole right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement thereof. The Licensor shall also have the sole right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.

If the Licensor undertakes the defense or prosecution of any litigation relating to the Marks, the Licensee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for the Licensor, be reasonably necessary to carry out such defense or prosecution, including becoming a nominal party to any legal action.  Except to the extent that such litigation is the result of the Licensee's use of the Marks in a manner that constitutes a material breach of this Agreement, the Licensor agrees to reimburse the Licensee for its out-of-pocket costs in doing such acts and things, except that the Licensee shall bear the salary costs of its employees, and the Licensor shall bear the costs of any judgment or settlement.  To the extent that such litigation is the result of the Licensee's use of the Marks in a manner that constitutes a material breach of this Agreement, the Licensee shall reimburse the Licensor for the cost of such litigation, including reasonable attorney's fees, as well as the reasonable cost of any judgment or settlement.

13.6    **Licensee's Acknowledgements.**  The Licensee expressly understands and acknowledges that:

13.6.1    The Licensor has the right to license to the Licensee the right to use, the Marks and the goodwill associated with and symbolized by them in the Territory.

13.6.2    The Marks are valid and serve to identify the System and those who are authorized to operate under the System.

13.6.3    Neither the Licensee nor any Affiliate of the Licensee shall directly or indirectly contest the validity of the Licensor's right to use and license others to use the Marks, nor shall the Licensee, directly or indirectly, seek to register the Marks with any government agency, except with the Licensor's express prior written consent.

13.6.4    The Licensee's use of the Marks does not give the Licensee any ownership interest or other interest in or to the Marks, except the license granted by this Agreement.

13.6.5    Any and all goodwill arising from the Licensee's use of the Marks shall inure solely and exclusively to the Licensor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with the Licensee's use of the System or the Marks.

13.6.6    The right and license of the Marks granted hereunder to the Licensee is non-exclusive except in connection with the Territory, whereas the Licensor has and retains the rights:

16.6.6.1    To use the Marks itself in connection with selling Products and Services in areas outside the Territory;

16.6.6.2    To grant other licenses for the Marks, in addition to those licenses already granted to existing Licensees and Unit

Franchisees (including this Agreement) in areas outside the Territory;

**16.6.6.3** To develop and establish other systems using the same or similar Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to the Licensee in areas outside the Territory.

**14** **NON-DISPARAGEMENT**

Each party hereby agrees to not, during the Term and thereafter, disseminate or cause dissemination of information that may be disparaging of or prejudicial to the other party or its Affiliates, the Products and Services, the System or any Franchisees, disseminate or seek to disseminate any information that may be disparaging of or prejudicial to the other party or its Affiliates, the Products and Services, the System or any Franchisees to any third party other than its professional advisors; or take any action that would reasonably be expected to cause damage to the reputation of the other party or its Affiliates, the Products and Services, the System or any Franchisees. This Clause does not, in any way, restrict or impede either party from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable Law or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

**15** **CONFIDENTIAL INFORMATION**

Neither party (the "Receiving Party") shall during the Term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, or corporation, Confidential Information of the other party (the "Disclosing Party") acquired by virtue of the parties' obligations under the terms of this Agreement except as required by law, regulation, judicial request or order, or as may be requested or required by any governmental authority. The Receiving Party shall divulge Confidential Information only to such employees that must have access to it in order to fulfill its obligations hereunder. The Receiving Party shall be responsible for any unauthorized disclosure of Confidential Information by its employees, agents or representatives. Any employee of the Receiving Party who may have access to any Confidential Information of the Disclosing Party shall execute a covenant that s/he will maintain the confidentiality of Confidential Information of the Disclosing Party.

**16** **THE SYSTEM**

**16.1** Access to the System. In order to protect the reputation and goodwill of the Licensor and to maintain high standards of operation under the Marks, the Licensee shall use commercially reasonable efforts to conduct the License Business in accordance with the System in all material respects, which the Licensee acknowledges having been granted access from the Licensor for the Term of this Agreement.

**16.2** Keep the System Current. The Licensee shall at all times use commercially reasonable efforts to ensure that the System, and any other Operations Manuals provided by the Licensee to the Master or Unit Franchisees, are kept reasonably current pursuant to the written instructions of the Licensor.

**17** **MARKETING AND PROMOTION**

Recognizing the value of promotion and marketing in developing the Territory, and the importance of consistency of such promotion and marketing to the furtherance of the goodwill and public image of the System, the parties agree as follows:

17.1    Advertising and Marketing.  During the Term, the Licensee shall use commercially reasonable efforts to advertise, market and promote the sale of Products Services Franchises and the License Business. All promotion and marketing by the Licensee (including the operation of a Website) concerning the System and Stores, and the offer of Franchises to prospective Franchisees, in any medium, shall be conducted in a dignified manner and shall conform to reasonable industry standards. In all promotion and marketing, the Licensee shall use the Marks only in accordance with the terms and conditions of this Agreement.

## 18    INSURANCE

18.1    Obtaining Insurance.  Without in any way limiting any of the Licensee's obligations, indemnities or liabilities under this Agreement or otherwise, the Licensee shall maintain in full force and effect at all times during the Term, at the Licensee's expense, a general liability insurance policy or policies protecting the Licensee, the Licensor and its Affiliates, and their respective officers, shareholders, directors, employees, and agents against any demand or claim with respect to property damage, or any loss, liability, or expense whatsoever arising or in connection with the operation of the License Business. If the Licensee fails to obtain such policies, the Licensor shall have the right to obtain such policies on the Licensee's behalf and to obtain from the Licensee reimbursement for the Licensor's costs in connection with obtaining such policies on behalf of the Licensee.  Such policy or policies shall:  (a) be written by substantially recognised global insurer(s); (b) cover the Licensor and its officers, shareholders, directors, employees, and agents, as additional insureds; (c) provide at least the types and minimum amounts of coverage as are customarily obtained by Persons carrying on activities in the Territory similar to those of the Licensee under this Agreement; and (e) contain a waiver by the Licensee and its insurers of their subrogation rights against the Licensor and its Affiliates and subsidiaries, and their respective officers, shareholders, directors, employees and agents.

18.2    Prior Notice to the Licensor.   At the Licensor's written request, the Licensee shall deliver to the Licensor Certificates of Insurance evidencing the proper types and minimum amounts of coverage.  All Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given the Licensor in the event of material alteration to or cancellation or non-renewal of the coverage's evidenced by such Certificates.

## 19    TRANSFER OF INTEREST

19.1    Transfer by Licensor. Licensor may, upon reasonable notice to the Licensee, transfer or assign any or all of its interest, rights or obligations in this Agreement without the prior consent of Licensee to any person or legal entity that demonstrates reasonable industry knowledge, managerial and business qualifications, that possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to be responsible for all obligations of the Licensor under this Agreement (as may be evidenced by prior related business experience or otherwise), and has adequate financial resources and capital to fulfil its obligations as a party to this Agreement. Licensor may transfer or assign any or all of its interest, rights or obligations in this Agreement to an Affiliate or subsidiary without the prior consent of Licensee. In the

event of such transfer, the Licensor shall execute a general release, in a reasonable form, of any and all claims against the Licensee arising from actions taken or events occurring prior to the date of assignment except for any outstanding moneys owed by the Licensor to the Licensee. Upon such transfer or assignment, the assignee of the Licensor shall become solely responsible for all obligations of the Licensor under this Agreement from the date of assignment.

19.2     Transfer by Licensee. Licensee may transfer or assign any or all of its interest, rights or obligations in this Agreement to a third party without the prior written consent of Licensor, provided that Licensee complies with the provisions of Clause 19.3 in connection therewith. Licensee may transfer or assign any or all of its interest, rights or obligations in this Agreement to an Affiliate or subsidiary or as security to one or more of Licensee's or its Affiliates' existing or future lenders without the prior written consent of Licensor and without observing the provisions of Clause 19.3.

19.3     Right of First Negotiation. If the either party elects to transfer or assign this Agreement, or all or any part of its rights or obligations hereunder (an "**Assignment**"), to a third party, it shall promptly serve a notice to the other party of such election (the "**ROFN Notice**") and the serving party hereby grants to the other party a right of first negotiation (the "**ROFN**") in respect of such Assignment. The party served the ROFN Notice may exercise its ROFN upon written notice to the serving party within seven (7) days from the date upon which the served party receives a ROFN Notice. In the event that the party served the ROFN Notice elects to exercise its ROFN, the parties shall enter into good faith negotiations in respect of such Assignment. If the Licensor and the Licensee, despite such good faith negotiations, are unable to reach agreement within twenty-one (21) days after the date upon which the ROFN was exercised, then the serving party will be free to assign its right as provided in Clause 19.1 or 19.2 as the case may be.

19.4     Bankruptcy. If the Licensee becomes a debtor in a proceeding under the bankruptcy Laws of the Territory or any other jurisdiction, it is the parties' understanding and agreement that any transfer of the Licensee, the Licensee's obligations and/or rights hereunder, any material assets of the Licensee, or any indirect or direct interest in the Licensee shall be subject to all of the terms of this Clause 19 subject to applicable Law.

19.5     Securities Offering. All materials required for any offering of securities, partnership, or other interests in the Licensee under any applicable Law shall be submitted to the Licensor by the offeror for review prior to filing with any government agency; and any materials to be used in any exempt offering shall be submitted to the Licensor for review prior to their use. No offering shall imply, by use of the Marks or otherwise, that the Licensor is participating in an underwriting, issuance, or offering of securities of either the Licensee or the Licensor; and the Licensor's review of any offering shall be limited solely to the subject of the relationship between the Licensee and the Licensor. The Licensee and the other participants in the offering must fully indemnify the Licensor in connection with the offering. The Licensee shall give the Licensor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Clause.

## 20     DEFAULT AND TERMINATION

20.1     Termination for Default. Either party may terminate this Agreement if the other party breaches any material obligation or term of this Agreement and, if such breach is capable of cure, such breach is not cured within thirty (30) days (or such longer period

agreed to in writing by the parties) of the breaching party's receipt of written notice thereof. Notwithstanding anything else in this Agreement, a breach or violation by a Franchisee of any Franchise Agreement shall not constitute a breach hereof by Licensee if the Licensee has used reasonable commercial endeavors to ensure such Franchisee complies with its Franchise Agreement.

20.2   Immediate Termination - Licensor. Notwithstanding the provisions of this Agreement the Licensor may terminate the Agreement immediately with written notice to the Licensee, if:

20.2.1   The Licensee attempts to transfer this Agreement without complying with the terms of this Agreement.

20.2.2   The Licensee becomes bankrupt, is or is deemed to be unable to pay its debts as and when they fall due, becomes insolvent under administration or an externally administered body corporate.

20.2.3   The Licensee voluntarily abandons the Business or the franchise relationship or fails to operate the License Business for more than fourteen (14) consecutive calendar days.

20.2.4   The Licensee, after curing a material default, willfully commits the same default again within six (6) months, whether or not cured after notice.

20.2.5   The Licensee knowingly provides any material and incomplete, false, or misleading information to the Licensor.

20.3   Immediate Termination - Licensee. Notwithstanding the provisions of this Agreement, the Licensee may terminate the Agreement immediately upon written notice to the Licensor, if the Licensor attempts to transfer this Agreement without complying with the terms of this Agreement, the Licensor becomes bankrupt, is or is deemed to be unable to pay its debts as and when they fall due, becomes insolvent under administration or an externally administered body corporate, or, after curing a material default, willfully commits the same material default again within six (6) months, whether or not cured after notice.

## 21   OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to the Licensee shall forthwith terminate, and the Licensee shall comply with the following:

21.1   Cease Operation. The Licensee shall immediately cease to operate the License Business, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as having any affiliation, past or present, with the Licensor and/or the System (except to the extent that the Licensee is a party to any Unit Franchise or other agreement with the Licensor).

21.2   Cease Use of the Marks. The Licensee shall immediately and permanently cease to use the Marks and distinctive forms, slogans, signs, and symbols associated with the System. The Licensee shall also cease to use, without limitation, all signs, marketing materials, stationery, forms, and any other articles which display the Marks. The Licensee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute the rights of the Licensor, and its Affiliates and subsidiaries' rights in and to the Marks, and further

agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with the Licensor constituting unfair competition.

**21.3**  **Cancel Assumed Name Registration.**  The Licensee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the Marks or any other proprietary marks of the Licensor's or its Affiliates', and the Licensee shall furnish the Licensor with evidence satisfactory to the Licensor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

**21.4**  **Pay All Sums Due.**  The Licensee shall pay within thirty (30) days all sums owing to the Licensor and its Affiliates under this Agreement.  In the event of termination for any default of the Licensee, the Licensee shall indemnify the Licensor for any Damages incurred by the Licensor or such Affiliate as a direct result of the default, Each party shall have the right to set-off any amounts which it deems are payable to it by the other party.

**21.5**  **Return of Materials.**  The Licensee shall immediately deliver to the Licensor the Unit Franchisee files referred to in this Agreement, all disclosure documents, marketing or promotional materials, manuals, records, files, instructions, correspondence, brochures, forms, agreements, and any and all other materials and all copies thereof in the Licensee's possession related to the License Business. Each party shall return the Confidential Information of the other party to such party.

**21.6**  **Cease use of the Numbers.** The Licensor owns all telephone numbers (including mobile phone and fax numbers), computer software, Internet addresses/sites, domain names, email accounts, the Intranet and any other communication services (collectively, the "**Numbers**") and any related directory listings and advertising, used primarily in connection with the operation of the License Business. Upon termination or expiration of this Agreement, the Licensee must immediately transfer, call-forward, discontinue or otherwise destroy any codes, including any passwords and any other relevant information issued to it by the Licensor as the Licensor may direct. The Licensee agrees to sign any reasonable documents and/or pay any amounts required by a telephone or communication services provider as a condition to the Licensor's dealing with the Numbers and any related directory advertising and listings.

**21.7**  Reserved.

**21.8**  **Bear Cost of Enforcement.**  The Licensee acknowledges that any failure to comply with the requirements of this Clause 21 will cause the Licensor irreparable injury, and the Licensee agrees to pay all court costs and reasonable attorney's fees incurred by the Licensor in obtaining specific performance of, or an injunction against violation of, the requirements of this Clause 21.

**21.9**  **Franchise Agreements.**  Upon termination or expiration of this agreement the Licensor shall, in its sole discretion, either assume all of the Licensee's rights under the Franchise Agreements then in effect in the Territory, transfer the Licensee's rights under such Franchise Agreements to another Licensee party, or terminate such Franchise Agreements, pursuant to the terms thereof.  If the Licensor chooses, in its sole discretion, to exercise its right to assume the Licensee's rights under any Franchise Agreement, or transfer the Licensee's rights under any Franchise Agreement, pursuant to this Clause 21.9, the Licensee shall:

21.9.1    in no way be relieved of its obligations under such Franchise Agreements, incurred prior to the date of such assignment, termination or transfer, including amounts owed to or obligations assumed on behalf of the Franchisees; and

21.9.2    execute such documents as the Licensor may request in order to implement this Clause 21.9.

21.10    Cease Contact. Upon termination or expiration of this Agreement the Licensee:

21.10.1    shall immediately cease to solicit prospective Franchisees and have contact with existing Franchisees (except for its Affiliates) with respect to the Business, System, and Franchise Agreements except as is reasonably required or appropriate in connection with its obligations under the Franchise Agreements;

21.10.2    shall not enter into any Franchise Agreements with new Franchisees nor any amendments to Franchise Agreements with then-existing Franchisees; and

21.10.3    shall not exercise any right or perform any obligation under the Franchise Agreements except with the Licensor's express prior written consent in each such instance.

21.11    Licensor's Option to Purchase

21.11.1    Option. Upon termination or expiration this Agreement, the Licensor will have the option to purchase from the Licensee all assets of the License Business and assume all of the Licensee's agreements relating to operation of the License Business (to the extent assignable) (the "Purchase Option"). The Licensor, at its option, may assign the Purchase Option under this Clause 21.11, without the Licensee's consent, to any Affiliate of the Licensor or other third party, and that Affiliate or other third party will have all of the Licensor's rights and obligations under this Clause 21.11. Each party will make all customary warranties, representations and other covenants or transfers in connection with any purchase pursuant to this Clause 21.11.1.

21.11.2    Purchase Price. The Licensor will notify the Licensee of its preliminary decision whether or not it will exercise the Purchase Option within forty five (45) days after the expiration or termination of this Agreement. During the thirty (30) day period following the Licensor's delivery of notice of its preliminary decision to exercise the Purchase Option the Licensor and the Licensee will negotiate in good faith to determine the Purchase Price based on the fair market value of the assets. If the parties are unable to agree in writing to the Purchase Price within such thirty (30) day period, then the Purchase Price shall be determined by an independent appraiser jointly appointed by the parties. All fees and costs of the appraisal shall be paid by the Licensee and Licensor equally.

21.11.3    Closing. Within thirty (30) days after determination of the Purchase Price pursuant to Clause 21.11.2, the Licensor shall provide the Licensee written notice of its final and binding decision regarding whether it will consummate the purchase contemplated by this Clause 21.11. The Purchase Price will be paid, in cash at the closing of the purchase. The closing shall take place no later than ninety (90) days after the Licensee's receipt of notice of the Licensor's final and binding exercise of the Purchase Option at which time

the Licensee must deliver instruments transferring to the Licensor or its assignee: (i) good and marketable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to the Licensor or its assignee); and (ii) all licenses and permits of the License Business which may be assigned or transferred. The Licensee shall use its commercially reasonable efforts and work in good faith towards obtaining the relevant landlord's consent to the assignment of any lease of Licensee's office and training facility. If the Licensee cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale shall be accomplished through an escrow.

## 22     CORPORATE AND PARTNERSHIP LICENSEES

**22.1**     Disclosure of Ownership Interests. The Licensee shall maintain a current list of all owners of record holding ten percent (10%) or more of the beneficial interest in the Licensee, and all beneficial owners of ten percent (10%) or more of any class of voting stock and/or other interests in the Licensee and shall furnish the list to the Licensor upon request.

## 23     TAXES, PERMITS, AND COMPLIANCE WITH LAW

**23.1**     Except as set forth herein, the Licensee shall promptly pay when due all taxes levied or assessed, and all accounts and other indebtedness of every kind incurred by the Licensee in connection with the License Business.

**23.2**     The Licensee shall comply with all Laws applicable to the License Business, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the License Business.

**23.3**     The Licensee shall notify the Licensor in writing within ten (10) business days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality which may materially and adversely affect the operation or financial condition of the License Business, including any involvement as a debtor in a proceeding under the bankruptcy Laws of the Territory, involving the Licensee or any officer, director, partner, or employee of the Licensee.

## 24     INDEPENDENT CONTRACTOR, LIABILITY, AND INDEMNIFICATION

**24.1**     This Agreement does not create or impose on the Licensor any fiduciary responsibilities with respect to the Licensee or the License Business nor does it create or impose on the Licensee any fiduciary responsibilities with respect to the Licensor. The Licensee shall be an independent contractor, and nothing in this Agreement is intended to make either party a legal representative, subsidiary, joint ventures, partner, employee, or servant of the other for any purpose.

**24.2**     During the Term, the Licensee shall hold itself out to the public as an independent contractor operating the License Business pursuant to a license from the Licensor. The Licensee agrees to take such action as may be necessary to do so.

The Licensee shall indemnify and hold the Licensor, the Licensor's shareholders, subsidiaries and Affiliates, and their respective officers, directors, employees, and agents harmless against any and all Damages arising directly or indirectly from any allegation, claim or complaint that is the result of, or in connection with, the Licensee's exercise of its rights and carrying out of its obligations hereunder. This includes any claim brought by any prospective or actual Franchisee and/or a government agency

concerning the Licensee or any Franchisees conduct within the Territory as well as from any breach of this Agreement by the Licensee. The Licensee's indemnity obligations shall survive the expiration or termination of this Agreement.

**24.3** The Licensor shall not, by virtue of any approvals, advice, or services provided to the Licensee or to the Franchisees, assume responsibility or liability to the Licensee, Franchisees, or any third parties to which it would not otherwise be subject.

**25 APPROVALS AND WAIVERS**

**25.1** Whenever this Agreement requires the prior approval or consent of the Licensor, the Licensee shall make a timely written request to the Licensor therefore, and such approval or consent must be obtained in writing, unless otherwise specified. The Licensor agrees that it shall not unreasonably withhold or unduly delay any consent or approval sought by the Licensee under this Agreement.

**25.2** The Licensor makes no warranties or guarantees upon which the Licensee may rely, and assumes no liability or obligation to the Licensee, by providing any waiver, approval, consent, or suggestion to the Licensee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefore.

**25.3** No delay, waiver, omission, or forbearance on the part of either party to exercise any right, option, duty, or power arising out of any breach or default by the other party under any of the terms, provisions, covenants, or conditions hereof, shall constitute a waiver by such party to enforce any such right, option, duty, or power as against the other party or as to any subsequent breach or default by the other party.

**26 NOTICES**

**26.1** Any notices, reports, records, financial statements, materials, and other communications between the parties hereto, required or permitted under this Agreement, shall be prepared and submitted in writing in the English language and may be served by delivering or posting the same to their respective addresses or by or otherwise to the respective solicitors for the parties, and service of notice on any one of the parties shall be deemed to be service on each of them. Notice will be deemed to be given:

**26.1.1** In the case of hand delivery, upon written acknowledgment of the party or by an employee, agent or representative of the receiving party;

**26.1.2** In the case of posting within seven (7) days after dispatch; and

**26.1.3** In the case of an email, when the sender's computer indicates that the message has been received.

**27 ENTIRE AGREEMENT**

**27.1** This Agreement and the exhibits referred to herein constitute the entire, full, and complete Agreement between the Licensor and the Licensee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced the Licensee to execute this Agreement. The parties agree that they are not relying on anything other than the words of this Agreement in deciding whether to enter into this Agreement. No amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

**28 SEVERABILITY AND CONSTRUCTION**

**28.1**  Except as expressly provided to the contrary in this Agreement, each portion, section, clause, part, term, and provision of this Agreement shall be considered severable; and if, for any reason, any section, clause, part, term, or provision in this Agreement is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and provisions of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, clause, parts, terms, or provisions shall be deemed not to be a part of this Agreement.

**28.2**  Except as expressly provided to the contrary in this Agreement, nothing in this Agreement is intended, nor shall be deemed, to confer upon any Person other than the Licensee, the Licensor, and their permitted assigns and transferees, any rights or remedies under or by reason of this Agreement.

**28.3**  This Agreement may be executed in several counterparts, and each copy so executed shall be deemed an original.

**29**  **GOVERNING LAW**

This Agreement is governed by, and all disputes arising under or in connection with this Agreement shall be resolved in accordance with, the Laws of Nevada. Nothing in this Clause is intended to subject this Agreement to any otherwise applicable business opportunity, franchise or similar law, rule or regulation to which it otherwise would not be subject.

**30**  **DISPUTE RESOLUTION**

**30.1**  In the event of any dispute arising from or in connection with this Agreement or the breach thereof, the parties shall use their commercially reasonable efforts to settle the dispute by consulting and negotiating with each other in good faith to attempt to reach a solution satisfactory to both parties. If they do not reach such solution the parties agree to the following procedure:

**30.2**  The party raising the dispute ('**Complainant**') will raise the matter with the other party ('**Respondent**') setting out in writing:

    **30.2.1**  The nature of the dispute;

    **30.2.2**  What outcome the Complainant wants; and

    **30.2.3**  What action the Complainant thinks will settle the dispute.

**30.3**  The parties will then, and within a period of thirty (30) days, try to agree about how to resolve the dispute. In the event that the dispute is not resolved via the process set out above within the said period of thirty (30) days, the dispute shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce in accordance with the said Rules. The place of the arbitration shall be as set forth in Exhibit A.

**30.4**  Except as may be required by law, neither a party nor its representatives nor a witness nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. Any documentary or other evidence given by a party or witness in the arbitration shall be treated as confidential by any party whose access to such evidence arises exclusively as a result of its participation in the arbitration and shall not be disclosed to any third party (other than a witness or expert), except as may be required by applicable law.

30.5 Notwithstanding the foregoing, either party has the right to apply to any court of competent jurisdiction for provisional relief, including pre-arbitral attachments, a temporary restraining order, temporary injunction, permanent injunction and/or order of specific performance, as may appear reasonably necessary to preserve the rights of either party.  The application by either party to a judicial authority for such measures shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the arbitrator.

30.6 Judgment upon any award(s) rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

30.7 Costs of Enforcement. In the event of any litigation or proceeding arising in connection with this Agreement, the non-prevailing party shall reimburse the prevailing party for all of its reasonable costs and expenses in connection therewith.

30.8 Non-exclusive Remedy.  No right or remedy conferred upon or reserved to the Licensor or the Licensee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by Law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

30.9 Limited Period for Claims.  Any and all claims and actions arising out of or relating to this Agreement or the relationship of the Licensee and the Licensor, brought by any party hereto against the other, shall be commenced within one (1) year from the occurrence of the facts giving rise to such claim or action, or, it is expressly acknowledged and agreed by all parties, such claim or action shall be irrevocably barred.

30.10 No Punitive Damages.  The Licensor and the Licensee hereby waive to the fullest extent permitted by law any right to or claim of any punitive, exemplary, special, consequential or indirect damages against the other (except to the extent actually paid to a third party), and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

31 **MISCELLANEOUS**

31.1 Independent Investigation.  The Licensee acknowledges that it has conducted an independent investigation of the License Business, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of the Licensee as an independent business, the  active participation in the daily affairs of the business, market conditions, area competition, availability of product, quality of services provided as well as other factors. The Licensor expressly disclaims the making of, and the Licensee acknowledges that it has not received, any warranty or guarantee, express or implied, orally or in writing, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

31.2 Sufficient Understanding. The Licensee acknowledges that it has read and understood this Agreement, the documents referred to in this Agreement and that the Licensor has accorded the Licensee ample time and opportunity to consult with advisors and/or attorneys of the Licensee's own choosing about the potential benefits and risks of entering into this Agreement.

31.3 Receipt of Disclosure.  If any laws, rules, or regulations in the Territory or elsewhere require the Licensor to provide the Licensee with a disclosure document in connection with the execution of this Agreement, the Licensee acknowledges having received the

Licensor's or Affiliates disclosure document in accordance with such applicable law and the Licensor hereby represents and warrants to the Licensee that it has provided the Licensee with all relevant documentation, information and other materials on the License Business and the transactions contemplated hereby.

31.4    Representation and Warranties.  Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from:

     31.4.1    negotiating and entering into this Agreement;

     31.4.2    exercising its rights under this Agreement; and/or

     31.4.3    fulfilling its responsibilities under this Agreement.

31.5    Limited Support.  The Licensee expressly that the Licensor will have no permanent or other establishment in the Territory to provide local support, marketing or operational assistance.  The Licensee acknowledges that it will not have the benefit of many of the products, services, training, technology and System elements that the Licensor offers to its licensees franchisees in other countries (the "Non-US Support") due to the nature of this License, and lack of the economic feasibility to do so.  The Licensee agrees that various systems and programs used by the Licensor in other regions may be inapplicable to the Licensee's and Franchisees' operations in the Territory, including point-of-sale systems, computer programs and technological developments, and internet / intranet-based programs and services, provided, that Licensor shall make the Non-US Support available to Licensee, at Licensee's option and expense..

31.6    Incorporation of Operations Manual. All the provisions of the Operations Manual as amended or revised from time to time or any new edition of it are incorporated into and form part of this Agreement as though fully set out in it and in the event of any conflict between a term of this Agreement and a provision in the Operations Manual the applicable term of this Agreement will prevail.

31.7    Force Majeure Event.  Neither party shall be responsible to the other for non-performance or delay in performance occasioned by a Force Majeure Event.

31.8    Continuing Obligations.  All obligations under this Agreement, which expressly or by their nature survive the expiration or termination of this Agreement, shall continue in full force and effect until they are satisfied in full or by their nature expire.

31.9    Bankruptcy of Licensor. If the Licensor becomes bankrupt or becomes insolvent or falls under the administration of an externally administered body corporate, the Licensee's ability to operate under the terms of this Agreement shall not be compromised and all rights and entitlements to conduct the License Business and System in the Territory under this Agreement shall continue as if such bankruptcy or insolvency had not occurred.

## 32    SPECIAL CONDITIONS

32.1    Post-Commencement Support. The Licensor C Level executives or such other appropriate employees will provide their commercially reasonable endeavors to support the Licensee during the 6-month post-Commencement period and collectively provide up to 20 hours per month of consulting time during this period if required. Any travel or out-of-pocket costs incurred in providing such support will be paid by the Licensee.

**32.2**    Company owned Stores.  Subject to agreement with the applicable Master Franchisee, the Licensee is permitted to establish and operate Stores in the Territory in its (or one or more of its Affiliates') own name. In such instances the Licensee (or its applicable Affiliate(s)).will be required to enter into a Unit Franchise Agreement under the name of a different Entity and the Store shall be established and operated solely under the terms of such Unit Franchise Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Agreement in duplicate on ___ December 2019.

Licensee
CARTRIDGE WORLD USA, LLC

......................................................
Martin Stein, Manager

Name: Martin   Stein

ADDRESS FOR NOTICES:

c/o Blackford Capital, Inc.
190 Monroe Avenue NW, Suite 600 Grand Rapids, MI 49503
Telephone:  616 233-3161
Attn: Martin Stein
E-mail: mstein@blackfordcapital.com


Licensor
EXECUTED by CARTRIDGE WORLD AUSTRALIA PTY       )
LTD                                             )
                                                )
(ACN 126 261 158)                               )

in accordance with Section 127(1) of the Corporations Act 2001 (Cth):


.................................................        ...............................................

Secretary/Director                                      Director

Edwin Lui                                               Rod Young


ADDRESS FOR NOTICES:

Level 8, 447 Kent Street
Sydney 2000 Australia
Liling

1501-08 Millennium City 5, 418 Kwun Tong Road, Kwun Tong, Kowloon, Hong Kong
Telephone: +852 2152 7764
Email: edwin.lui@cartridgeworld.com.au
Attn: Edwin Lui

34

**IN WITNESS WHEREOF**, the parties hereto have duly executed, sealed, and delivered this Agreement in duplicate on __ **December 2019**.

Licensee
**CARTRIDGE WORLD USA, LLC**

..................................................
Director

Name

**ADDRESS FOR NOTICES:**

c/o Blackford Capital, Inc.
190 Monroe Avenue NW, Suite 600 Grand Rapids, MI 49503
Telephone:  616 233-3161
Attn: Martin Stein
E-mail: mstein@blackfordcapital.com

Licensor
**EXECUTED by CARTRIDGE WORLD AUSTRALIA PTY LTD**                                     )
                                                                                       )
                                                                                       )
**(ACN 126 261 158)**                                                                  )

in accordance with Section 127(1) of the Corporations Act 2001 (Cth):

..................................................                    ..................................................

Secretary/Director                                                   Director

Edwin Lui                                                            Rod Young

**ADDRESS FOR NOTICES:**

Level 6, 447 Kent Street
Sydney 2000 Australia
Llling

1501-08 Millennium City 5, 418 Kwun Tong Road, Kwun Tong, Kowloon, Hong Kong
Telephone: +852 2152 7764
Email: edwin.lui@cartridgeworld.com.au
Attn: Edwin Lui

34

**CARTRIDGE WORLD NORTH AMERICA LLC**

Former Franchisor

..................................................

**Edwin Lui**
Director

..................................................

**Rod Young (Name)**
Director

**ADDRESS FOR NOTICES:**

1501-08 Millennium City 5, 418 Kwun Tong
Road, Kwun Tong, Kowloon,
Hong Kong
Telephone: +852 2152 7764
Email: edwin.lui@cartridgeworld.com.au
Attn: Edwin Lui

**EXHIBIT A**
**DATA SHEET**

**ITEM 1   LICENSEE**

Cartridge World USA, LLC

c/o Blackford Capital, Inc.
190 Monroe Avenue NW, Suite 600 Grand Rapids, MI 49503
Telephone:  616 233-3161
Attn: Martin Stein
E-mail: mstein@blackfordcapital.com

**ITEM 3   TERRITORY**

The United States of America

**ITEM 4   COMMENCEMENT DATE**

23 December 2019 or earlier by mutual consent of the Parties

**ITEM 5   TERM**

Thirty (30) years from the Commencement Date

**ITEM 6   RENEWAL TERM**

One additional term of fifteen (15) years, with the renewal term beginning on the
expiration of the Initial Term or any carry-over of the Initial Term.

**ITEM 7   PAYMENT CURRENCY**

US Dollars.

**ITEM 8   INITIAL LICENSE FEE**

Two Million Six Hundred Thousand Dollars ($2,600,000) in cash paid on or before the
Commencement Date.

**ITEM 9   RENEWAL FEE**

One Hundred Thousand Dollars ($100,000)

**ITEM 10   ADDITIONAL LICENSE FEE**

Where the United States Cartridge World network Gross Revenue exceeds Sixty
Million Dollars ($60,000,000) in any Calendar Year during the Term of this Agreement
and any Renewal Term of this Agreement, the Licensee shall pay an Additional
License Fee equivalent to one half of one percent (0.5%) of that amount of the US
Cartridge World system Gross Revenue that exceeds Sixty Million Dollars
($60,000,000) in that Calendar Year.

When applicable, such amount shall be payable to the Licensor within Thirty (30) days
of the end of that Calendar Year.

**ITEM 11   SEAT OF ARBITRATION**

New York City

**ITEM 12   DOMAIN NAME**

www.cartridgeworldusa.com

**EXHIBIT B**
**THE "MARKS"**

| Trade Mark No. | Trade Mark. | Status | Owner |
|---|---|---|---|
| 4-2004-008588 | Cartridge World and Star Device  | Registered | Cartridge World Australia Pty Ltd |
| 4-2006-500439 | CARTRIDGE WORLD | Registered | Cartridge World Australia Pty Ltd |

**EXHIBIT C**
**COMPUTER SOFTWARE, WEBSITE AND INTRANET USAGE**

**PREFACE**

The parties acknowledge that the use of information technology is integral to the System and its proper usage and that both parties will derive benefit from it.  The parties therefore agree:

**ITEM 1  COMPUTER SOFTWARE**

1.1    Computer Software Provider.  The Licensor may enter into agreements with computer software providers, as described in the Operations Manual ("**Software Provider**") to enable the Licensee to make available computer software and hardware to be used by its Franchisees ("**Computer Software**").

1.2    Computer Software Provider. The Licensee undertakes to enter into:

    1.2.1    A license agreement in respect to the Computer Software with the Software Provider) ("**Software License**").

1.3    Licensee's Obligations.  In relation to the Software License, the Licensee agrees to:

    1.3.1    Enter into the Software License as required from time to time and keep the same valid and ongoing during the Term.;

    1.3.2    Comply with any obligations that are required from time to time relating to the use of the Computer Software;

    1.3.3    Promptly after entering into the Software License, properly install, or arrange for the installation of, the Computer Software at its own reasonable cost;

    1.3.4    Use the Computer Software only as authorised by this Agreement and the Software License and in accordance with the provisions of the Operations Manual;

    1.3.5    Establish and carry out reasonable backup procedures for the Computer Software as reasonably required or directed by the Software Provider from time to time and ensure that it has adequate hardware and support installed to maintain the Computer Software;

    1.3.6    Ensure its personnel and Franchisees use the Computer Software and are properly trained in its use; and

    1.3.7    Protect the Software Provider's and the Licensor's rights in the Computer Software as provided for in the Software License.

1.4    Licensee's obligations in relation to Software Sub-Licenses. In relation to the Software Sub-Licenses that the Licensee enters into with each of its Franchisees, the Licensee agrees to use commercially reasonable efforts to::

    1.4.1    Cause each Franchisee to enter into a Software Sub-License on entering into a Unit Franchise Agreement with the Licensee or Master Franchisee;

    1.4.2    Ensure compliance by each Unit Franchisee with all terms and conditions of the Software Sub-License;

    1.4.3    ;

    1.4.4    Cause each Unit Franchisee to provide access to the Software Provider for the purposes of installing the Computer Software and training the Unit

Franchisees and their personnel on the proper use of the Computer Software; and

**1.4.5** Cause each Unit Franchisee to pay any fees and other costs promptly as and when they fall due.

**1.5** Virus and Harmful Code Protection. The Licensee must use commercially reasonable efforts to :

**1.5.1** Ensure that no computer program virus or other code that is harmful, destructive, disabling or which assists in or enables theft or alteration of data (Harmful Code) is coded or introduced into the Computer Software;

**1.5.2** Use virus detection software in conforming with any reasonable directions issued by the Software Provider and/or in accordance with the terms and conditions of the Software License;

**1.5.3** If any Harmful Code is found to have been introduced into the Computer Software, the Licensee must:

(a) Immediately report that to the Software Provider and/or the Licensor; and

(b) Take all reasonably necessary remedial action to eliminate the Harmful Code and prevent re-occurrence, the cost of which will be borne by the Licensee.

**1.5.4** Impose all these obligations on any Unit Franchisee with which it enters into a Software sub-License.

**1.6** Software License Fee. The Licensee undertakes the following in relation to the Software License Fee:

**1.6.1** The Licensee will pay the Licensor (or, at the Licensee's option as applicable, the Software Provider) all license, maintenance and upgrading fees for the Computer Software (Software License Fee), and any applicable taxes, in accordance with the terms and conditions of the Software License; and

**1.6.2** The Licensee acknowledges that:

(a) It is responsible for the payment of the Software License Fee, and any applicable taxes, as directed by the Licensor; and

(b) Indemnifies the Licensor against any failure by the Licensee to pay the Software License Fee, and applicable taxes, in accordance with this clause.

**1.7** Software Sub-License Fees. The Licensee undertakes the following in relation to the Software Sub-License Fee:

**1.7.1** The Licensee will ensure that each of its Unit Franchisees enter into a Software Sub-License with the Licensee(or, at the Licensor 's option, the Licensor or the Software Provider) and that they will make all payments of the Software Sub-License Fee as and when they fall due to the Licensee(or at the Licensors option, directly to the Licensor or the Software Provider.

**ITEM 3** **DOMAIN NAME AND EMAIL ACCOUNTS**

The Licensee agrees with the Licensor:

2.1     The Licensee must not register any domain names or internet address incorporating the Name or any part of the name, any similar names, any of the Marks or any part of the Marks, or any words or names similar to the Marks without the Licensor's prior written consent which will not be unreasonably withheld or delayed and on the terms which include the right of the Licensor to acquire the domain name or internet address on expiration or termination of this Agreement.

2.2     The Licensee acknowledges that the Licensor has a prior and superior right to registration of any such domain names.

2.3     The Licensee acknowledges that if a domain name or internet address is to be used in the Licensee's Business, then it must be registered in the name of the Licensor or a nominee of the Licensor. For the avoidance of doubt, the parties acknowledge that the Licensor may require that any existing "Cartridge World" related domain names to be transferred to it at any time and the Licensee must procure the transfer if requested to do so.

## ITEM 4     OWNERSHIP AND CONTROL OF WEBSITE

3.1     The Licensor has exclusive ownership and control of all websites relating to or associated with the System and the Marks and grants the absolute right to the Licensee to use the Website and data from the Website in the Territory subject to the terms and conditions in this Agreement.

3.2     Unless otherwise approved in writing by the Licensor, the Licensee shall neither establish nor permit any Unit Franchisee or any other party to establish a Website relating in any manner whatsoever to the License Business, the System, Name or Marks. If the Licensor approves a Website for the Licensee then each of the following provisions shall apply:

    3.2.1     Any website address, domain name and other identifiers used in any Website owned or maintained by or for the benefit of the Licensee shall belong to the Licensor;

    3.2.2     The Licensee shall not establish or use any Website without the Licensor's prior written approval;

    3.2.3     The Licensee must comply with the Licensor's standards, policies and procedures and specifications for Websites as prescribed by the Licensor from time to time;

    3.2.4     If required by the Licensor, the Licensee shall establish such hyperlinks to the Licensor's Website and others as the Licensor may request in writing.

## ITEM 5     E-COMMERCE AND OWNERSHIP OF DATA

4.1     The Licensee acknowledges and agrees that the Licensor has the ownership of, but Licensee shall have the exclusive right to use, all elements of the Website and data derived from the operation of the website including URL's and codes of all kinds and grants sole and exclusive right to the Licensee to conduct business, advertise for business and generate sales of products and services from the Website and engage in E-Commerce using the Marks to any and all customers and grants to the Licensee the right to manage and use the website and data to conduct E-Commerce in the Territory subject to the terms and conditions in the US License Agreement.

4.2    The Licensee agrees to fully cooperate with the Licensor in its conduct of business via the Website in such manner reasonably required by the Licensor.

4.3    The Licensee will only collect and use personal information or other data from visitors to and customers of the Stores and Website subject to such collection and use being permitted under applicable law.

4.4    The Licensee acknowledges and agrees that all names, information, mailing lists and data bases, from whatever source derived, shall be and remain the sole and exclusive property of the Licensor. The Licensee shall have exclusive use of and access to such information during the term of this Agreement and any renewal thereof that relates to the Territory.